UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

CR03-537 (S-2) (R.J.D.)

UNITED STATES OF AMERICA

- v -

LEDRELL HART, et al.,
                    Defendants

------------------------------------------------------------x

FOURTH SUPPLEMENTAL
SENTENCING MEMORANDUM
ON BEHALF OF
LEDRELL HART

HARRY C. BATCHELDER, JR.
Counsel for Ledrell Hart
Sixty-First Floor
40 Wall Street
New York, New York 10005-1338
212-530-4480

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

                                                          CR03-537 (S-2) (R.J.D.)

UNITED STATES OF AMERICA

                         -  v  -

LEDRELL HART, et al.,
                         Defendants

-----------------------------------------------------------x

<u>FACTS</u>

       The crack sentencing legal battle detailed in Ledrell Hart's prior sentencing memorandums would appear to have been won with the passage of the Fair Sentencing Act of 2010, Pub. L. No. 111-2200 § 1, ___ Stat.___, hereinafter "Fair Sentencing Act").  However, brave legal scouts have reported that, for reasons difficult to understand, and, in counsel's view, not in play in this case, Government attorneys continue to oppose both the spirit and letter of reasoned opinion and law as to crack cocaine sentencing.  The legal equivalent of the Battle of the Somme and Marne careens toward the legal equivalent of Ypres in the crack sentencing trenches.  Less than rhetorically, when will the cool breezes of common sense prevail in the crack sentencing theatre?

<u>ARGUMENT</u>

I.      MR. HART SHOULD NOT BE SUBJECT TO A MANDATORY MINIMUM
        SENTENCE.

On August 3, 2010, the President of the United States signed into law the Fair Sentencing

Act of 2010, Public Law  No. 111-220.  The law modified the quantities of crack cocaine that

subject violators of 21 U.S.C. § 841(a) to the various penalties set forth in § 841(b)(1) and §

1986.  Specifically, the law changed the quantity of crack cocaine triggering a five-year

mandatory minimum term of imprisonment from 5 grams to 28 grams, and changed the quantity

of crack cocaine triggering a ten-year mandatory minimum prison term from 50 grams to 280

grams.  The law thus eliminated the so-called "100:1 ratio" between the amounts of powder

cocaine and crack cocaine needed to trigger the mandatory minimums, in effect, changing the

ratio to 18:1.  <u>See</u> Fair Sentencing Act of 2010, Pub. L. No. 111-220, § 1, ___ Stat. ___.

Although at the initial sentencing the Court found Mr. Hart responsible for distributing an

amount of crack that would trigger a mandatory minimum, counsel urges the Court to reconsider

that finding given recent developments.

       A.      STANDARD OF REVIEW FROM THE INCEPTION OF THE SENTENCING
PROCESS MR. HART CONSTANTLY BATTLED THE CRACK TO POWDER COCAINE
RATIO, THUS, THIS COURT MAY CONSIDER <u>DE</u> <u>NOVO</u> ALL SENTENCING ISSUES.

       B.      SENTENCING LEDRELL HART TO A MANDATORY MINIMUM THAT
COUNSEL CONTENDS NO LONGER APPLIES TO HIM WOULD CONSTITUTE PLAIN
ERROR.

       "The general rule is that a new statute should apply to cases pending on the date of its

enactment unless manifest injustice would result or there is a statutory directive or legislative

history to the contrary."  <u>United States</u> v. <u>Kolter</u>, 849 F.2d 541, 543-44 (11th Cir. 1988) (citing

Bradley v. School Board of Richmond, 416 U.S. 696, 711-14 (1974); United States v.
Fernandez-Toledo, 749 F.2d 703, 705 (11th Cir. 1985); Central Freight Lines, Inc. v. United
States, 669 F.2d 1063, 1069 (5th Cir. 1982); Corpus v. Estelle, 605 F.2d 175, 180 (5th Cir. 1979)).
Because Mr. Hart's sentencing will fall subsequent to the date the Fair Sentencing Act took
effect, the Act applies to him unless one of several exceptions (i.e., a statutory directive,
legislative history to the contrary, or manifest injustice) operates to preclude application.  For the
reasons argued below, no exception applies to Mr. Hart's case, so the general rule applies.

Under the common law doctrine of abatement, when a legislature repealed a criminal
statute or otherwise limited the scope of conduct previously deemed criminal, all pending
criminal prosecutions involving such conduct were to be dismissed.  See, Bell v. Maryland, 378
U.S. 226, 230 (1964).  Statutes that were repealed but reenacted with different penalties, and
statutes amended to decrease penalties, also fell within the abatement rule.  Bradley v. United
States, 410 U.S. 605, 607-08 (1973).  Further, the rule applied to any proceeding that had not yet
reached a final disposition, i.e., it applied to all defendants whose convictions had not yet
become final.  Bell, 378 U.S. at 230.  Thus, under the common law doctrine, there would be no
question that Mr. Hart would be entitled to the benefit of the Fair Sentencing Act.

A legislature may avoid such a result, however, either by including a specific "savings
clause" within the legislature or by application of a general savings clause.  As an example of the
former, when Congress enacted the Comprehensive Drug Abuse Prevention and Control Act of
1970, in which it eliminated provisions prohibiting parole for certain mandatory sentences (in
other words, parole would be permitted in the future), Congress included a specific savings
clause limiting application of the new, favorable provisions to offenses committed after the Act's

effective date.  Bradley, 410 U.S. at 606-07, 608.  In contrast, the Fair Sentencing Act contains no specific savings clause.[1]

An example of the later is the general federal savings clause, 1 U.S.C. § 109, which was enacted in its original form in 1971 to abolish the application of the common law abatement doctrine in federal law.  Warden, Lewisburg Penitentiary v. Marrero, 417 U.S. 653, 660 (1974).  Entitled "Repeal of statutes as affecting existing liabilities," the statute in its current codification provides in relevant part that

> [t]he repeal of any statute shall not have the effect to release or
> Extinguish any penalty, forfeiture, or liability incurred under
> Such statue, unless the repealing Act shall so expressly provide,
> and such statute shall be treated as still remaining in force for the
>  purpose of sustaining any proper action or prosecution for the
> enforcement of such penalty, forfeiture, or liability.

1  U.S.C. § 109.

Notwithstanding the saving clause's requirement of an express legislative provision authorizing retroactive benefit, there are at least two recognized exceptions to the savings clause that permit retroactive application of the Fair Sentencing Act to Mr. Hart's case:  first, the statutory change redefines a term, and second, the statutory change is remedial or curative.  Kolter, 849 F.2d at 543-44; United States v. Blue Sea Line, 553 F.2d 445, 448-50 (5th Cir. 1977); United States v. Mechem, 509 F.2d 1193 (10th Cir. 1975); 2 J. Sutherland, Statutes and Statutory Construction § 41:4 (Norman J. Singer and J. D. Shambie Singer, 7th ed. 2010).

1.   The Statutory Change Merely Redefines a Term

In United States v. Kolter, 849 F.2d 541 (11th Cir. 1988), the Eleventh Circuit considered the retroactivity of amendments to the federal firearms statutes, and in particular, an amendment

---

[1] Notably, another bill introduced to address the powder/crack cocaine disparity did contain an express savings clause.  See, H.R. 265, reproduced at 156 Cong. Rec. H6199, H6202 (section 11 "Effective Date").

to 18 U.S.C. § 921(a)(20), that were enacted after the defendant committed his offense conduct but before he was tried and convicted.  At the time the defendant committed the offense, he was considered a convicted felon because Supreme Court precedent dictated that the term "convicted felon" be defined in accordance with federal law, and federal law provided that "the restoration of <u>Kolter's</u> civil rights would not bar his federal conviction as it did not alter the historical fact of his state felony convictions," <u>Id.</u> At 543 (citing <u>Dickerson</u> v. <u>New Banner Institute, Inc.</u>, 460 U.S. 103, 111-12, 114-15 (1983)).  The amendment to § 921(a)(20) rejected <u>Dickerson's</u> holding and redefined the term "conviction…in accordance with the law of jurisdiction in which the proceedings were held."  <u>Id.</u> (quoting 18 U.S.C. § 921(a)(20).  The new statute further provided, "any conviction …for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter unless such…restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." <u>Id.</u> (quoting 18 U.S.C. § 921(a)(20)).  Under the new law, therefore, the defendant "would not be a 'convicted felon' as the restoration of his civil rights was not qualified by a firearms restriction." Id. The issue in <u>Kolter</u> was thus whether the new law applied to the defendant.

The Government argued that in light of the general savings clause, the old law applied, not the new one.  849 F.2d 544.  The Eleventh Circuit disagreed, stating:

> We agree with the government that § 109 applies to this case insofar as prosecutions under § 1202(a), the statute under which Kolter was convicted, are saved even though § 1202(a) has been repealed.  However, in enacting § 921(a)(20), Congress did not repealed a statute – it changed the rule announced in <u>Dickerson</u> v. <u>New Banner Institute</u>, which had interpreted a statue.  Because § 921(a)(20) did not repeal a statute but merely changed Dickerson's definition of a "*convicted felon*." § does not save the old definition.
>
> Moreover, even if § 921(a)(20) had repealed a statute, § 109 would not apply as the redefinition of "convicted felon" did not "release or extinguish any penalty, forfeiture, or disability. "Penalty, forfeiture, any penalty, forfeiture,

is synonymous with punishment.  The redefinition of "convicted felon" did
not affect the punishment provided but merely altered the class of persons
for whom the specified conduct is prohibited.

Id. (internal citations and footnote omitted; emphasis added).

The Kolter court's reasoning applied with equal force to Mr. Hart's case.  The Fair Sentencing Act does not "release or extinguish any penalty" set forth in 21 U.S.C. § 841(b)(1)(A) or (b)(1)(B).  The statutory penalties remain ten years to life imprisonment and 5 to 40 years' imprisonment, respectively.  Instead, what the Act did was redefine the offenders who qualify as "serious" and "major" traffickers because those offenders are the ones against whom the minimum mandatory sentences were aimed.  [Emphasis Supplied]  See, Floor Proceedings on Fair Sentencing Act, 156 Cong. Rec. H6199 (July 28, 2010) (hereafter "Floor Proceedings") (H.R. 265, Finding No. 4) ("In 1986, Congress linked mandatory minimum penalties to different drug quantities, which were intended to serve as proxies for identifying offenders who were 'serious' traffickers (managers of retail drug trafficking) and 'major' traffickers (manufacturers or the kingpins who headed drug organizations).")  [Emphasis Supplied]  The Act merely reclassified "serious" traffickers as offenders who traffic in 28 grams or more of crack, and "major" traffickers as offenders who traffic in 280 grams or more of crack.

Congress adjusted the drug quantity levels because it realized that by including persons who were involved with more than 5 but less than 28 grams in the "serious" traffickers definition, it was "sweeping]…"low-level crack cocaine users and dealers" into the net that it had intended to catch what it considered more "serious" dealers.  Floor Proceedings, 156 Cong. Rec. at H6200 (H.R. 265, Fining No. 10(E)).  Congress further found that "[a]s a result of the low-level drug quantities that trigger lengthy mandatory minimum penalties for crack cocaine, the concentration of lower level Federal offenders is particularly pronounced among crack

7

cocaine offenders, more than half of whom were street level dealers in 2005."  Floor

Proceedings, 156 Cong. Rec. at H6200 (H.R. 265, Finding No. 14).  This was more than enough

justification for Congress to modify the definitions of "serious" and "major" traffickers upon

which it based the drug quantities that triggered the minimum mandatory penalties.  Thus, like

the firearms statue at issue in <u>Kolter</u>, the Fair Sentencing Act merely changed a previous

definition and "altered the class of persons for whom the specified conduct is prohibited"—here

the conduct of trafficking in a certain quantity of crack.  <u>Kolter</u>, 849 F. 2d at 544.  Accordingly,

it is clear that the savings clause of 1 U.S.C. § 109 does not bar retroactive application of the Fair

Sentencing Act to Mr. Hart.

      2.    <u>The Statutory Change Is Remedial or Curative</u>

     As the Supreme Court has recognized, "the general savings clause does not ordinarily

preserve discarded remedies or procedures."  <u>Warden, Lewisburg Penitentiary</u> v. <u>Marrero</u>, 417

U.S. 653, 661, (1974).  In other words, it is well established that where a statutory change is

procedural or remedial (i.e., curative), it applies retroactively.  <u>See</u> <u>United States</u> v. <u>Vanella</u>, 619

F. 2d 384, 386 (5th Cir. 1980) (applying the rule that "statutory changes that are procedural or

remedial in nature apply retroactively"); <u>Turner</u> v. <u>United States</u>, 410 F.2d 837, 842 (5th Cir.

1969) (stating that "changes in statute law relating only to procedure or remedy are usually held

immediately applicable to pending cases, including those on appeal from a lower court);

Sutherland, <u>Statutes and Statutory Construction</u> § 41:00 ("A curative act is a statute is a statute

passed to cure defects in prior law….Generally, curative acts are made necessary by

inadvertence or error in the original enactment of a statute…[and] can be given retroactive effect

if it is designed merely to carry out or explain the intent of the original legislation.")  (footnotes

8

omitted).  The Fair Sentencing Act is obviously remedial, in that it cures defects in the 1986

Anti-Drug Abuse Act.  Therefore, it applies to Mr. Hart's case.

Because the distinction between substance and procedure can be difficult to discern,

consideration of legislative history is appropriate.  See, Marrero, 417 U.S. at 662; United States

v. Blue Sea Line, 553 F.2d 445, 449 (5th Cir. 1977); United States v. Mechem, 509 F.2d 1193,

1195 (10th Cir. 1975).  The legislative history of the Fair Sentencing Act, in particular the Floor

proceedings held on the date of passage by the House, clearly demonstrates the remedial,

curative nature of the Amendment to 21 U.S.C. § 841(b)(1).  The predominant purpose of the

legislation was not to change the penalties, rather, the Act simply restructured how the penalties

are applied, and to whom, to ensure the achievement of Congress's original goal of punishing

higher-level drug dealers more severely than lower-level dealers.

To explain, in 1986, Congress enacted a drug sentencing scheme in which Congress

intended that "serious" drug traffickers would be punished with sentences of a minimum of five

years up to a maximum of 40 years, and "major" drug traffickers would be punished with

sentences of a minimum of ten years, up to a maximum of life imprisonment.  As proxies for

those terms, Congress elected to use drug quantity.  For powder cocaine offenses, Congress

selected 500 grams to trigger the five-year mandatory minimum penalty, and 5,000 grams (five

kilograms) to trigger the ten-year mandatory minimum penalty.  For crack cocaine offenses,

however, Congress selected five grams to trigger the five-year minimum and 50 grams to trigger

the ten-year minimum, thus resulting in the so-called 100:1 ratio of powder to crack cocaine.

See Floor Proceedings, 156 Cong. Rec. at H6199-6200.  This ratio was not founded upon any

empirical evidence.  See id, at H6202 (statement of Rep. Lungren) ("{The conclusion} that there

is a basis for treating crack and powder differently is in no way a justification for the 100-to-1

9

sentencing ratio contained in the 1986 drug bill.  We initially came out of committee with a 20-to-1 ratio.  By the time we finished on the floor, it was 100-to1.  <u>We didn't really have an evidentiary basis for it, but that's what we did, thinking we were doing the right thing at the time.").</u> [Emphasis Supplied]

More than twenty years of experience, however have shown that the proxy quantities were set too low, sweeping in large number of street-level dealers in crack cocaine and diverting limited law enforcement resources from prosecution of the intended targets of the 1986 law.  <u>See</u>, e.g., Floor Proceedings, 156 Cong. Rec. at H6199 (written statement of Rep. Lee); <u>Id</u>. at H6200 (H.R. 265, Finding Nos. 10(E), 14, 15, 16).  Further, the passage of time has established that the assumptions giving rise to the 100:1 ration were largely unfounded.  <u>See</u>, Floor Proceedings, 156 Cong. Rec. At H6197 (statement of Re. Scott) (noting lack of pharmacological difference between crack and powder cocaine); <u>Id</u>. At H6198 (statement of Rep. Clyburn) (<u>"Twenty years of experience have taught us that many of our initial beliefs were wrong."</u>); [Emphasis Supplied] <u>Id</u>. at H6199 (written statement of Rep. Lee) ("Although Congress in the mid-1980's was understandably concerned that the low-cost and potency of crack cocaine would fuel an epidemic of use by minors, the epidemic…never materialized to the extent feared."); <u>Id</u>; at H6200 (H.R. 265, Finding No. 9).  Finally, the past twenty years have established the disparate impact of the 100:1 ratio on African Americans throughout the United States.  <u>See</u>, Floor Proceedings, 156 Cong. Rec. at H6197 (statement of Rep. Scott); <u>Id</u>. at H6200 (H.R. 265, Finding No. 16); <u>Id</u>. at H6202 (statement of Rep. Lungren); <u>Id</u>. at H6203 (statement of Rep. Hoyer).

To remedy these defects in the 1986 law and to effectuate the original intent of that legislation, Congress enacted the Fair Sentencing Act of 2010.  As the formal name of the Act

indicates, its purpose is "[t]o restore fairness to Federal cocaine sentencing."  See, S. 1789,

enacted as Pub. L. No. 111-220 ("An Act to restore fairness to Federal cocaine sentencing").

The relevant portions of the Act do not change the statutory minimum mandatory or maximum

penalties under 21 U.S.C. §§ 841(b)(1)(A)(iii) or (B)(iii).  See, Floor Proceedings, 156 Cong.

Rec. at H6203 (statement of Rep. Scott) (observing that the bill "does not eliminate the

mandatory minimums").  Indeed, the basic penalties for § 841 (b)(1)(A)(iii) remain ten years to

life imprisonment, and the penalties for § 841 (b)(1)(B)(iii) remain 5 to 40 years.  Instead of

repealing or amending the "penalties" for crack cocaine, the new law simply effects a structural

modification by redefining the class of persons to whom the minimum mandatory penalties

apply.  As various House members recognized, by doing so the Act "helps to correct an

enormous disparity in our criminal justice system," Id. at H6198 (statement of Rep. Clyburn), it

"makes an attempt to correct a very, very serious problem in equal justice in our system," Id. at

H6203 (statement of Rep. Paul), and it goes toward "correcting this severely disproportionate

and unfair anomaly in our law enforcement[,]" Id. at H6202 (statement of Rep. Ellison).

       In light of the obvious intent of Congress to remedy the errors contained in earlier

legislation, the Fair Sentencing Act applies to Mr. Hart's case, and the  savings clause  of 1

U.S.C. § does not apply.  By the Government's own admission, Mr. Hart was a marginal player

at best in the charged conspiracy.  Given all that has transpired in this case it is most unseemly,

that the Government contends that the Fair Sentencing Act does not apply to Mr. Hart.  Based

upon the facts of this case, it is not a stretch to state that the Act was specifically made for

Mr. Hart.

      II.    <u>Government opposition to the application of the Act to Mr. Hart is more than</u>

                <u>"unseemly."</u>

The Government finds itself in the position of advocating against a position which reasoned members of the judiciary, commentators, a unanimous Congress and others, including the United States Department of Justice, believe it is "fair and just."

There are numerous and sound policy reasons for rejecting the 100 to 1 ratio and indeed eliminating it.  See, Spears v. United States, 129 S. Ct. 840 (2009); United States v. Medina, 2009 WL 2948325 (S.D. Ca. Sept. 11, 2009) [Detailing the Sentencing Commission's attempts to change the 100 to 1 ratio found at 1.]  Statement of Larry Breuer, Assistant Attorney General, Criminal Division, United States Department of Justice, before the United States Committee on the Judiciary, Subcommittee on Crimes and Drugs, Hearing "Restoring Fairness to Federal Sentencing:  Addressing the Crack-Powder Disparity" (April 29, 2009), available at hhp://JudiciarySenate.gov/pdf/09-04-29 Breuer Testimony.pdf; statement of Judge Reggie B. Walton, On Behalf of the Judicial Conference of the United States, Before the United States Senate Committee on the Judiciary, Subcommittee on Crime and Drugs, Hearing Entitled "Restoring Fairness to Federal Sentencing:  Addressing the Crack-Powder Disparity," at 8-9 (April 29, 2009); and United States v.  Russell, 2009 WL 2485734 (W.D. Pa. Aug. 12, 2009) (same); United States v. Carter, 2009 WL 2578958 (W.D. Va. Aug. 18, 2009) (applying a 1-to-1 ratio); United States v. Luck, 2009 WL 2462192 (W.D. Va. Aug. 18, 2009); United States v. Greer, 2010 WL 1223089 (E.D. Tex. March 30, 2010).  Given this lineup, it is difficult to understand the United States Attorneys Office for the Eastern District New York's volte face on crack sentencing.  It is as though the dictum of "Main Justice" has no meaning!

It is not necessary for the Court to involve itself in the Kantian intricacies of the "Savings Clause."  It is crystal clear that Government counsel is urging the Court to adopt a sentencing calculus that is wildly out of sync with everything that has transpired in reasoned sentencing

pertaining to crack cocaine in the past two years.  The Court should categorically reject the Government's position—you cannot have it both ways.

     III.    <u>Zeus has spoken or perhaps not spoken.</u>

It is believed by many that Senior Judge Jack B. Weinstein has never seen a sentencing issue he did not have a strong opinion on.[2]  On September 7, 2010 Judge Weinstein was faced with a situation in which the defendant was charged with selling both cocaine base and cocaine <u>United States</u> v. <u>Wayne South</u>, 08 CR 119 (J.B.W.).  In Zeus-like fashion Judge Weinstein indicated he was sentencing the defendant based solely upon the cocaine amount and was not factoring the crack amounts into his sentencing calculus.[3] To divine the "meaning" of this lightning sentencing thunderbolt is to require a trip to Delphi.  However, it is reasonable to deduce that Judge Weinstein did not cut the cocaine/crack Gordian knot, but simply chose to go his own way and treated both substances alike.  One thing that is clear from the transcript of the proceedings is that Judge Weinstein did not wish to hear argument from either counsel as to the issues advanced in Point One of this memorandum.  As of the creation of this memorandum I was unable to find any additional authority on this issue.

---

[2] This statement is a corollary of the widely held belief in baseball that most Latin ballplayers have never seen a first pitch, no matter where it is that they don't like.  Lest this be considered racially motivated, I adopted the statement from New York Yankee announcers Michael Kay and Ken Singleton in their broadcast of September 12, 2010 of the Yankees game against the Texas Rangers.  The statement was made with reference to Dominican ballplayer Vladimir Guerrero, a notoriously "bad ball" hitter.  Guerrero promptly ripped a wicked double in the gap on a pitch thrown somewhere around his shoe tops.

[3] Government counsel advised the Court they would be appealing this sentence, but less than an hour later advised defense counsel they would not be appealing the sentence—a new world's record!

CONCLUSION

THE COURT SHOULD NOT IMPOSE A MANDATORY MINIMUM SENTENCE
UPON MR. HART.

Dated: September 15, 2010
New York, New York

Respectfully submitted:

/s/:    Harry C. Batchelder, Jr.
_____

HARRY C. BATCHELDER, JR.
Counsel for Ledrell Hart
Sixty-First Floor
40 Wall Street
New York, New York 10007-1338
212-530-4480

Certification

I hereby certify that on September 15, 2010, a true copy of the above Fourth Sentencing
Memorandum on behalf of Ledrell Hart was sent via ECF to Assistant United States Attorney
Elizabeth Geddes and via United States Postal Service to Michael Gold, Esq. and the Office of
United States Probation for the Eastern District of New York.

/s/:    Harry C. Batchelder, Jr.
_____

HARRY C. BATCHELDER, JR.

14